IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TYRONE MOCK, | CASE NO. 1:22-cv-00937-PAB |
| Petitioner, | DISTRICT JUDGE PAMELA A. BARKER |
| vs. | |
| WARDEN CHARMAINE BRACY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Respondent. | **REPORT & RECOMMENDATION** |

Petitioner Tyrone Mock filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Doc. 1. Mock is currently in custody at the Trumbull Correctional Institution serving a 13-year sentence imposed by the Cuyahoga County Court of Common Pleas in *State v. Mock*, Case No. CR-15-597566-A. This matter has been referred to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Mock's petition.

### Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state court are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

According to the Ohio Court of Appeals for the Eighth Appellate District:

{¶ 2} Appellant cultivated a large check-fraud ring that operated throughout northeast Ohio. He enticed Jerome Bohanon ("Bohanon"), an employee of a check-cashing business, to supply him with business names, bank account and routing numbers, and recent check numbers. Appellant would then research the businesses and determine when would be the best time to attempt to cash the checks so as to avoid security procedures in place at many banks.

{¶ 3} Appellant, along with Jonnell George ("George"), would then recruit individuals to cash these checks and split the money. After recruiting an individual, appellant would create counterfeit checks for amounts just below $1,000, using the information obtained from Bohanon. The checks were made payable to the actual names of the person cashing the checks. Appellant told several of these individuals that they would only face minor criminal repercussions from the scheme and could make anywhere from $200 to $400 per transaction.

{¶ 4} Police departments around northeast Ohio, as well as bank investigators, noticed a spike in fraudulent checks. Based on the similarities between the checks, officers in the Rocky River Police Department believed that the separate incidents were related. Detective William Duffy ("Det. Duffy") interviewed a suspect, D.H., who was identified as an individual that had cashed some fraudulent checks. She detailed her participation in the scheme and how she came to be involved. She also disclosed that she received the check from a person named "Ike" and gave police Ike's phone number. She showed them text messages she received from "Ike," asking her if she wanted to cash more checks. She also described his car, a white Oldsmobile Aurora.

{¶ 5} Det. Duffy, by way of a court order signed by a municipal court judge, obtained phone records from a cell phone carrier for the number provided by D.H.

The subscriber information did not provide a name, and the address was for a California residence. Det. Duffy determined that the cell phone was one he considered a "burner" phone, or an anonymous cell phone. Using the call logs, Detective Craig Witalis ("Det. Witalis") was able to link the number to other phone numbers and an address on Monticello Boulevard in Richmond Heights, Ohio. After checking records, detectives learned that there was a 1999 white Oldsmobile Aurora owned by someone that resided at the address. Rocky River detectives obtained a search warrant signed by a common pleas court judge to place a GPS tracker on the car, and with the assistance of Rocky River Detective Tracey Hill, who is also a sworn Cuyahoga County Sheriff's deputy, did so on May 11, 2015. Det. Witalis, along with several other officers, conducted surveillance when the car moved.

{¶ 6} Bohanon testified he provided appellant with information useful in creating counterfeit checks in exchange for money. Det. Witalis testified that from their surveillance of appellant, a pattern emerged. Appellant would visit Bohanon's place of employment, and then a few days later, appellant would drive to different banks. Sometimes appellant would arrive with another person in his car. Other times appellant would meet another person at the location. The other person would then go into the bank, come out, and meet up with appellant. Officers took pictures and recorded the location of the stops using software for the GPS tracker. At trial, Det. Witalis authenticated surveillance photos of these encounters.

{¶ 7} Detectives also investigated other individuals that participated in the scheme, and several gave statements implicating appellant.

{¶ 8} Officers eventually gained enough information to seek a search warrant for the Monticello Boulevard home, which was issued. There, officers found items appellant used to create forged checks, including check stock, printers, legitimate checks

from certain businesses together with forged copies from those businesses, computer programs with past templates of forged checks, cash, and computer searches of businesses that had been the target of the check fraud.

{¶ 9} Appellant was arrested and charged in a 185–count indictment with engaging in a pattern of corrupt activity, conspiracy, money laundering, forgery, theft, telecommunications fraud, identity theft, and possession of criminal tools.

....

{¶ 13} Prior to trial, 65 counts were dismissed at the state's request. At trial, seven codefendants, including Bohanon, testified against appellant. At the conclusion of trial, 11 counts were dismissed at the state's request. Of the counts that remained, appellant was found not guilty of several counts of forgery and money laundering. He was found guilty of engaging in a pattern of corrupt activity ("RICO"), a violation of R.C. 2923.32(A)(1); conspiracy, a violation of R.C. 2923.01(A)(1); 28 counts of forgery, violations of R.C. 2913.31(A)(3); 29 counts of money laundering, violations of R.C. 1315.55(A)(3); 9 counts of petty theft, violations of R.C. 2913.02(A)(3); 7 counts of aggravated theft, violations of R.C. 2913.02(A)(3); 6 counts of telecommunications fraud, violations of R.C. 2913.05(A); 1 count of identity theft, a violation of R.C. 2913.49(C); 1 count of forging identification cards, a violation of R.C. 2913.31(A)(2); and 1 count of possession of criminal tools, a violation of R.C. 2923.24(A).

{¶ 14} At sentencing, the trial court merged the conspiracy count into the RICO count at the state's request. The court also merged each count of theft and forgery with each corresponding money laundering count. If a theft and forgery count did not have a corresponding money laundering count, then those counts were sentenced separately. This resulted in an aggregate 13–year prison sentence,

composed of a 10–year prison term for the RICO count, a 2–year term for each of the 29 counts of money laundering imposed concurrent to each other but consecutive to the RICO sentence, and a 1–year term for fourth-degree felony telecommunications fraud imposed consecutive to the RICO and money laundering counts. The following sentences were imposed concurrent to each other and all other counts: 11 months for each of the four counts of fifth-degree felony telecommunications fraud, 17 months for the other fourth-degree felony telecommunications fraud, 30 months for the identity fraud, 11 months for the possession of criminal tools, 17 months for forgery, and 6 months for theft.

*State v. Mock*, 106 N.E.3d 154, 156–59 (Ohio Ct. App. 2018).

## Procedural history

*Trial court proceedings*

Mock filed three suppression motions in the trial court. He moved to suppress "evidence flowing from [the] search warrant" issued in his case. Doc. 5-1, at 141–44. Mock also moved to suppress evidence obtained from the GPS tracker. Doc. 5-1, at 160–61. Finally, on the day of the suppression hearing, he also filed a pro se supplemental suppression motion arguing about the GPS tracker and raising other constitutional issues. Doc. 5-1, at 170–96.

The Ohio appellate court summarized what happened during the suppression hearing:

{¶ 11} A suppression hearing was held where the state called two detectives to testify about their investigation of D.H. Det. Duffy testified about D.H.'s statements regarding a phone number belonging to an individual named "Ike" that provided fraudulent checks to her, and that he then

> sought a court order from a municipal court judge for phone records regarding that number. The detective testified about the information that was disclosed to the judge, and appellant's attorney questioned the witnesses about information that was not disclosed. This information included the fact that D.H. lied to police about her address, and that she was recently hospitalized for mental illness. Other issues raised in appellant's suppression motions were not addressed at the hearing, and appellant called no witnesses and did not introduce any exhibits. Appellant's attorney did ask a few questions of the detective regarding the circumstances under which they attached the GPS unit to the car, but the warrant for GPS tracking was not introduced during the hearing.

*Mock*, 106 N.E.3d at 157–58. The trial court denied Mock's motions on the record and in a journal entry. *Id.* at 158; Doc. 5-1, at 197.

As noted, Mock was later convicted and sentenced to an aggregate 13-year term of imprisonment. Doc. 5-1, at 256–59. The trial court issued a journal entry reflecting Mock's conviction and sentence on September 30, 2016. Doc. 5-1, at 256–59.

*Direct appeal*

Mock filed a timely notice of appeal to the Eighth District Court of Appeals in Cuyahoga County, Ohio. Doc. 5-1, at 261. In Mock's brief, appellate attorney David N. Patterson raised the following assignments of error on Mock's behalf:

> I.  The Trial Court erred in deny Appellant's Motion to Suppress Affidavits and Warrants for Installation and Monitoring of a GPS Tracking Device which violated his rights under the Fourth Amendment of the United

6

States and Article I Section 14 of the Ohio Constitution and the Courts failure to give Appellant findings of Facts and Conclusion of Law on relevant Constitutional Issues thereby denying Appellant's due process.

II.   The Trial Court erred in denying Appellant a fair trial, due to the State and Detectives in this case intentionally failing to disclose through discovery material exculpatory evidence relating to Accomplice/Co-Defendants which violated his rights under the Fourth Amendment of the United States and Article I Section 10 of the Ohio Constitution.

III.  The Trial Court erred in denying Appellant Rule 29 Motion for Acquittal as to the charges when the State presented insufficient evidence to sustain Appellant's convictions and/or Appellant's convictions is against the manifest weight of the evidence and thereby Appellant was denied due process under the Fourth Amendment of the United States and Article I Section 10 of the Ohio thereby denying Appellant's due process.

Doc. 5-1, at 317–59.[1] Mock later filed a supplemental assignment of error:

Appellant was denied the effective assistance of Trial Counsel, in violation of his Sixth Amendment right, and due process of law, when Trial Counsel failed to conduct a Pretrial investigation and interview crucial witnesses, and Trial Counsels failure to file a Motion to Suppress deficient and invalid search warrant to search and seize the contents of computer and the warrantless to search and seize of cell phone contents in violation of Appellant's Fourth Amendment Rights.

---

[1]   I've reproduced Mock's assignments of error as written.

Doc. 5-1, at 366–80. In January 2018, the Ohio court of appeals affirmed the trial court's judgment and sentence. *Mock*, 106 N.E.3d 154; Doc. 5-1, at 438–68.

Mock filed a timely appeal with the Supreme Court of Ohio in March 2018. Doc. 5-1, at 469–70. In an amended memorandum in support of jurisdiction, Doc. 5-1, at 523–38, Mock raised three "proposition[s] of law":

I. The Trial Court erred in denying appellants Motion to Suppress affidavits and search warrants for installation and monitoring of a GPS Tracking Device which violated his Rights Under the Fourth Amendment of the United States Constitution and Article I, Section 14 of the Ohio Constitution, and the Courts failure to give Appellant Findings of Fact and Conclusions of Law on relevant Constitutional issues thereby denying Appellant's Right to Due Process.

II. Appellant was denied a fair trial, due to the State and Detectives in this case intentionally failing to disclose through discovery material exculpatory evidence relating to Accomplice/Co-Defendant in violation of Appellants Rights Under the Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III. Appellant was denied Effective Assistance of Trial Counsel, in violation of his Sixth Amendment Right and Due Process of Law when Trial Counsel failed to conduct a Pre-trial investigation and interview crucial witnesses, and Trial Counsels failure to file a Motion to Suppress deficient and invalid search warrant to search and seize the contents of computer and the warrantless search and seizure of cell phone contents in violation of Appellants Fourth Amendment Rights.

Doc. 5-1, at 524.

On June 6, 2018, the Ohio Supreme Court declined under its Rule of Practice 7.08(B)(4) to accept jurisdiction of Mock's appeal. Doc. 5-1, at 587.

*Delayed motion for a new trial*

The 90-day period for Mock to seek review in the United States Supreme Court expired on September 4, 2018. One hundred and one days later, on December 14, 2018, Attorney Patterson filed on Mock's behalf in the trial court a 75-page delayed motion for a new trial, citing Ohio Rule of Criminal Procedure 33(A)(1), (2), and (6). Doc. 5-1, at 588–662. With this motion, Mock filed a motion for an order finding that he was "unavoidably prevented from filing a [timely] motion for new trial." Doc. 5-2, at 7–85.

In his delayed motion for a new trial, Mock claimed to have "obtained newly discovered evidence." Doc. 5-1, at 588. He also claimed that the government withheld discovery related to his:

> alleged accuser and Co-defendant [redacted],[2] her alleged proffer, her taped interview and photo array whereby she allegedly positively identified Defendant Mock, the terms of her negotiations and plea agreement with the State, as well as cellphone subscriber records containing cellphone location data and SMS/MMS Text messages, lexis nexis results, warrants for cellphones and the Defendant's alleged recorded dash cam confession.

*Id*. at 589; *see id*. at 654–55.

---

[2]    Mock's co-defendant's name is redacted in Mock's motion. In other documents associated with the motion, she is referred to as a confidential informant or as a co-defendant. Her initials are, however, listed in other places in the record as D.H. For simplicity, I'll use her initials in this Report and Recommendation.

Mock first asserted that he had obtained "notes containing written questions from [his] … Jury to his Trial Court Judge," which "contain the written answers/responses from [the] Judge … back to the … Jury." Doc. 5-1, at 600. He asserted that the communications were not reflected in the trial transcript and that the communications violated his due process rights and his rights under the Sixth Amendment. *Id*. at 601, 605–12.

These assertions were supported by an affidavit sworn by Linda Head, who "assist[ed]" Patterson. Doc. 5-1, at 725. She averred that she discovered the notes in 2018, while reviewing the trial record. *Id*. Head also said that "soon after obtaining a copy of the notes," she became ill and was twice hospitalized. *Id*. She thus failed to inform Patterson of her discovery until August 2018. *Id*. at 726.

Mock next asserted that his prosecutor and "Lead Detective Craig Witalis … intentionally lied about, manufactured, falsified and intentionally with bad faith withheld from the defense the existence of relevant material exculpatory evidence in Defendants criminal case and trial." Doc. 5-1, at 612. Specifically, Mock claimed that Witalis provided false information in a May 7, 2015 affidavit that "he submitted … for the purpose of misleading the issuing Court by falsely establishing probable cause to obtain a Search Warrant to install and monitor a Battery[-]Operated GPS Tracking Device on" Mock's vehicle. *Id*.; *see id*. at 633, 645. Mock argued that the affidavit was "based on speculations, conjectures and hypotheticals." *Id*. at 613. He added that he had

obtained new evidence that showed that Witalis had perjured himself in the affidavit. *Id*. at 615. In part, Mock's new evidence consisted of his "close review" of the affidavit and testimony from the suppression hearing. *See id*. at 615–18, 633–34, 655–59.

Mock proceeded to attack the warrant with reference to testimony presented during the suppression hearing. Doc. 5-1, at 616–18. He added that he had evidence—an October 2018 affidavit from Patterson, Doc. 5-1, at 680–84, and Mock's own phone interview with a witness—that showed that Tammy Jordan and Brandon Fambro, whom Witalis allegedly testified were connected to Mock's residence, were not actually connected to it. *Id*. at 618–19. Mock also relied on an April 2018 affidavit from Jordan. *Id*. at 618–19; *see id*. at 685–86. According to Mock, the prosecution's failure to disclose the absence of a connection amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. at 620.

Before continuing his claim of newly discovered evidence, Mock attacked the warrant based on his argument that the government's informant was unreliable. Doc. 5-1, at 622–26.

Returning to his claim of newly discovered evidence, Mock alleged that D.H.'s proffer letter did not implicate him. Doc. 5-1, at 626. He asserted that detectives and the prosecutor "intentionally omitted these relevant facts and events with total disregard for the truth and purposely withheld this information from the defense in this case." *Id*. at 627, 629. Mock added that

through Patterson's interview with D.H.'s attorney, Mitchell Yelsky—which took place in May 2018, *see id.* at 632—he had evidence that Witalis provided false information in his affidavit in support of the warrant application, *id.* at 628, 631–32.

Based on the above, Mock argued that the exclusionary rule should apply. Doc. 5-1, at 632–35; *see id.* at 650–53. Mock also argued that he was identified in a manner that was "unduly and impermissibly suggestive." Doc. 5-1, at 635–37.

Returning to the GPS tracking warrant, Mock asserted that Witalis knew that the affidavit and the warrants were invalid. Doc. 5-1, at 639. He argued that the affidavits failed to establish probable cause, *id.* at 639–40, and the warrants were impermissible general warrants, *id.* at 640, *see id.* at 647–48, which violated his rights under the Fourth Amendment, including his right to privacy, *id.* at 641–44. Mock added that the trial court lacked authority to issue a warrant "to be executed outside of the jurisdiction of the Cuyahoga County Court of Common Pleas Court." *Id.* at 645–46; *see id.* at 646–47.

Next, Mock argued that there was no basis to execute the warrants at night. Doc. 5-1, at 648–49.

Mock argued that under Ohio Rule of Criminal Procedure 16, he was entitled to a new trial because the state suppressed favorable evidence, in violation of *Brady* and its progeny. Doc. 5-1, at 653–54. He added that the detectives and the prosecutor "fabricated and improperly used their alleged

first time, unverified confidential informant," *id*. at 654, and the government "withheld … the terms and conditions of any deal, contract or plea agreement" with D.H., *id*. at 655, and other "relevant material exculpatory and exonerating evidence," *id*. at 660. According to Mock, Witalis and another detective had committed perjury during the suppression hearing and Mock's prosecutor "knew that … Witalis had [committed] perjur[y]" in three affidavits. *Id*. at 661.

The trial court ordered the parties to file supplemental briefs on the issue of "whether there was unavoidable delay in obtaining new evidence to be used in support of a motion for a new trial." Doc. 5-2, at 429. Along with a supplemental brief, the State submitted Yelsky's affidavit in which he declared, among other things, "I never told … Patterson anything remotely close to his false statements contained" in several paragraphs of his affidavit. Doc. 5-2, at 459.

On June 24, 2019, the trial court denied Mock's motion for leave to file a motion for a new trial. *Id*. at 463. In an attached order, the court explained its determination that Mock had not carried his burden by "clear and convincing evidence that he was unavoidably delayed from obtaining evidence." *Id*. at 464–71.

As to the jury questions, the trial court noted that the trial "record was made available to the parties on November 7, 2016." Doc. 5-2, at 467. But aside from his own incarceration, which couldn't support an unavoidable-delay claim, Mock only pointed to Ms. Head's hospitalization *in 2018*. *Id*. The trial

13

court noted that "'[a] claim that evidence was undiscoverable simply because the defense did not take the necessary efforts to obtain the evidence sooner does not meet the requisite standard.'" *Id*. (citation omitted). So Mock hadn't shown that he or counsel acted with "reasonable diligence." *Id*.

Regarding the search warrants, the trial court noted Mock had submitted Patterson's affidavit, which in part detailed Patterson's May 19, 2018 interview of Yelsky. Doc. 5-2, at 468; *see* Doc. 5-1, at 680–81. The court also noted that the State submitted an affidavit from Yelsky, "who categorically denie[d] that he told … Patterson 'anything remotely close' to what … Patterson averred." Doc. 5-2, at 468; *see id*. at 459. Putting aside the possibility that Patterson provided false statements, the trial court remarked that:

> Mock has not identified any reason he was impeded from interviewing … Yelsky about these matters earlier. The role of the confidential informant and the basis of the GPS warrants were key to the earlier suppression hearing. These matters had been known to Mock from even before the trial. Moreover, he does not identify any steps he or counsel took to obtain this evidence in the period since his conviction until May 2018 when … Patterson interviewed … Yelsky.

Doc. 5-2, at 469. So Mock failed to show "that he was unavoidably delayed from obtaining evidence challenging the basis of the search warrants for the GPS tracker." *Id*. at 470.

Finally, the trial court addressed phone records for Jordan and Fambro. The court noted that Jordan is the mother of Mock's child. Doc. 5-2, at 470. It

also found that "Mock was well acquainted with both Jordan and Fambro, and their relevance to the case was certainly known to Mock and counsel as their names had come up during the suppression hearing as being on the call logs." *Id*. The court observed that Mock had not "identif[ied] any impediments that would have prevented him from obtaining Jordan's affidavit or Fambro's statement" before March 2018, or "any steps he took to obtain this information other than … Patterson stating he contacted Jordan in March of 2018."[3] *Id*. Mock had also not explained why Mock or Patterson had waited until March 2018 to contact Jordan. *Id*. at 471.

Mock filed a notice of appeal on July 23, 2019. Doc. 5-2, at 472. In his supporting brief, Mock argued that the trial court erred by finding that he was not unavoidably delayed in discovering previously undisclosed jury questions and answers and evidence of *Brady* violations. *Id*. at 493–524.

The Eighth Appellate District Court of Appeals affirmed the trial court on July 9, 2020. Doc. 5-2, at 592–06. The court of appeals agreed that Mock had not carried his burden. *Id*. at 600–04.

As to the jury notes, the court remarked that Head only "generally" asserted "that she discovered the notes 'in 2018.'" Doc. 5-2, at 600. But although the record had been available since November 7, 2016, Mock didn't explain why no one had examined it between then and whenever in 2018 Head

---

[3]    Patterson declared that he contacted Jordan in March 2018 and interviewed Fambro in July 2018. Doc. 5-1, at 682.

located the notes. *Id*. Further, Patterson represented Mock in his appeal to the court of appeals and to the Ohio Supreme Court and "could have reviewed the record long before" Head reviewed it. *Id*. at 601. The court of appeals added that the fact that Patterson or Head failed until 2018 to examine the record didn't mean that the jury questions and answers were unavailable before then. *Id*.

Regarding the search warrants and phone records, the court of appeals noted that Patterson had declared that he investigated Mock's case in relation to filing a direct appeal. Doc. 5-2, at 603. Yet he didn't contact Jordan, Yelsky, or Fambro, until March, May, and July, 2018, respectively, after the court of appeals' January 2018 decision in Mock's direct appeal. *Id*. And although "Ms. Jordan, Ms. Fambro, the confidential informant, and the basis for the GPS warrant were all mentioned at the suppression hearing that was held on June 1, 2016," Mock didn't explain what prevented Patterson from contacting them sooner. *Id*. The court explained that "claims that evidence was undiscoverable simply because the defense did not take the necessary steps earlier to obtain the evidence," would not suffice to carry Mock's burden. *Id*. at 603–04. It thus concluded that the trial court did not abuse its discretion. *Id*. at 602, 604.

Mock sought reconsideration and *en banc* review in a motion and supporting brief filed on July 20, 2020. Doc. 5-2, at 608–17. The court of appeals denied Mock's application on February 26, 2021. *Id*. at 647.

Mock filed a notice of appeal with the Ohio Supreme Court on April 21, 2021. Doc. 5-2, at 648–49. He also filed a pro se memorandum in support of jurisdiction. *Id.* at 651–66. On June 8, 2021, the Ohio Supreme Court declined under its Rule of Practice 7.08(B)(4) to accept jurisdiction of Mock's appeal. Doc. 5-2, at 683.

*Motion for supplemental discovery*

Meanwhile, on May 4, 2021, Mock filed in the trial court a "motion for supplemental demand for discovery" under Ohio Rule of Criminal Procedure 16(B)(1)–(3), (5)–(7). Doc. 5-2, at 685–95. He first "demand[ed]" a copy of D.H.'s proffer and the photo array she was shown when she identified Mock.[4] *Id.* at 685–87. Mock also demanded his and D.H.'s phone records, which he argued the prosecutor had failed to disclose.[5] *Id.* at 687–88. Next, Mock demanded phone records and "Lexis Nexis information" for Jordan and Fambro.[6] *Id.* at 688–91. Mock argued that the trial court erred when it held that Mock lacked "an expectation of privacy in subscriber information and numerical phone numbers." *Id.* at 692. Finally, he argued that his prosecutor committed a *Brady*

---

[4]     In his delayed motion for a new trial, Mock had by contrast argued that D.H. had not made a proffer and had not been shown a photo array. Doc. 5-1, at 626, 632–33, 656, 659.

[5]     In his delayed motion for a new trial, Mock extensively discussed his and D.H.'s phones, and the prosecutor's alleged failure to disclose evidence relating to them. *See* Doc. 5-1, at 589, 616–18, 622, 654–55, 657, 659–60.

[6]     These records featured in Mock's delayed motion for a new trial. *See* Doc. 5-1, at 618–19.

violation because "she knew … that … Witalis and [another detective] had falsified crucial facts, records, documents and evidence yet she actively conspired with them, then she actively sought to cover it." *Id*. at 693.

The trial court denied Mock's motion on June 1, 2021. Doc. 5-2, at 728.

*Federal habeas proceedings*

Mock filed his *pro se* petition for writ of habeas corpus on June 1, 2022. Doc. 1, at 29. He raised the following grounds for relief:

> *Ground one*: Petitioner was deprived fundamental fairness of due process of law, the right to a fair trial and the protection of the 4th and 14th Amendments to the U.S. Constitution when the trial court failed to provide a full and fair hearing and an appropriate ruling and adjudications on his motions to suppress evidence, supplemental motion to suppress evidence, and pro se supplemental motion to suppress evidence, violations of (Franks v. Delaware) with findings of fact and conclusions of law relevant to his constitutional issues concerning instillation of GPS tracking device.
>
> *Ground two*: Petitioner was deprived fundamental fairness of due process of law due to the prosecution before and after trial intentionally failing to disclose through discovery relevant in nature (evidence that was attested by detective Witalis) material, exculpatory evidence related to indicted accomplice/co-defendant CI#2 D.H. in violation of Petitioner's rights under the 4th, 5th, 6th & 14th Amendments to the U.S. Constitution clearly (Brady v Maryland) violations.
>
> *Ground three*: Petitioner was deprived fundamental fairness of due process of law when Petitioner was denied the effective assistance of counsel and a fair trial as guaranteed by the 6th & 14th Amendments to the U.S. Constitution, violations of (Strickland v Washington) when trial counsel failed to conduct

pretrial investigations and interview crucial witnesses and failed to file a motion to suppress evidence obtained via a deficient and invalid search warrant to search and seize the contents of a computer and the warrantless search and seizure of cell phone contents in violation of Petitioner's 4th & 14th Amendment rights.

*Ground four*: Petitioner was denied fundamental fairness and due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution when he was not permitted review of his issues for new trial based on new affidavit evidence from the attorney for Confidential Informant #2, D.H., the material sole factor used to establish probable cause for search warrants, Tammy Jordan, and Atty. David Patterson who interviewed Brandon Fambro, which disproved any nexus for probable cause, The Motion for New Trial under Criminal Rule 33 was denied based on a finding that the Petitioner was not unavoidably delayed in discovering issues that involved clearly encompassed ongoing violations as defined in (Brady v Maryland) police and prosecutorial misconduct consistent with Napue v Illinois), Petitioner was denied a fair trial under the rights granted by the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

*Ground five*: Petitioner was denied fundamental fairness of due process of law under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution when he was not permitted review of his issues, in Petitioners Motion for New Trial, under Criminal Rule 33 based on a finding that the Petitioner was not unavoidably delayed in discovering previous undisclosed jury questions and the courts answers for new trial, based on the new discovery of evidence exposing material and prejudicial ex parte communications between the trial court and the jury, without notice and opportunity to be heard, which also constitutes structural error because Petitioner had a right to be represented by counsel at all critical stages and tried

19

> by an impartial jury without irregularities in the
> proceedings, Thereby committing judicial
> misconduct.

Doc. 1, at 10–25. Respondent Warden Charmaine Bracy filed a return of writ
in response. Doc. 5. Mock filed a traverse. Doc. 9.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.
L. 104-132, § 104, 110 Stat. 1214 ("AEDPA" or the 1996 Act), habeas petitioners
must meet certain procedural requirements to have their claims reviewed in
federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th
Cir. 2006). "Procedural barriers, such as statutes of limitations and rules
concerning procedural default and exhaustion of remedies, operate to limit
access to review on the merits of a constitutional claim." *Daniels v. United
States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes
confused with exhaustion, exhaustion and procedural default are distinct
concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to
exhaust applies when state remedies are "still available at the time of the
federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).
But when state court remedies are no longer available, procedural default
rather than exhaustion applies. *Id.*

### *Exhaustion*

A federal court may not grant a writ of habeas corpus unless the
petitioner has exhausted all available remedies in state court. 28 U.S.C. §

2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts") (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). And a habeas petitioner must present both the factual and legal underpinnings of the claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present the claims to the state courts as federal constitutional issues and not just as issues arising under state law. *See, e.g., Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).

*Procedural default*

Procedural default may occur in two ways. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred

on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal

claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and establish actual prejudice resulted from the alleged violation of federal law, or show that a fundamental miscarriage of justice will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

## Discussion

*1. Review of grounds one through four of Mock's petition is time-barred*

*1.1. Section 2244(d)(1)(A) bars review of grounds one through four*

The 1996 Act provides a one-year limitations period in a habeas action brought by a person in custody from a state court judgment. The limitations period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The Act also provides that:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

For our purposes, subparagraphs (B) and (C) are not implicated in this proceeding. I'll thus start with subsection (d)(1)(A), which asks when Mock's "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." As used in subsection (d)(1)(A), the term *direct review* "encompass[es] review of a state conviction by [the United States Supreme] Court." *See Clay v. United States*, 537 U.S. 522, 528 n.3 (2003). A conviction is thus final after the expiration of the 90-day window for seeking review with the United States Supreme Court. *See Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009); *Linscott v. Rose*, 436 F.3d 587, 591 (6th Cir. 2006).

The Ohio Supreme Court declined to accept jurisdiction of Mock's appeal on June 6, 2018. Doc. 5-1, at 587. Ninety days after that date was September 4, 2018. So the statute of limitations began to run next day and Mock had until September 5, 2019, to file his habeas petition. But he didn't file it until June 1, 2022. As result, unless another provision or rule of law would render Mock's

petition timely, the Court should dismiss Mock's petition with respect to grounds one through four.

As noted, Mock filed a delayed motion for a new trial on December 14, 2018. Because Mock filed the motion *after* the completion of his direct appeals, the motion was not part of Mock's original criminal proceedings and is instead a collateral proceeding.[7] *See Pudelski v. Wilson*, 576 F.3d 595, 608–10 (6th Cir. 2009). So the motion could potentially toll the running of the statute of limitations; it couldn't restart the clock. *Lopez v. Wilson*, 426 F.3d 339, 345–46 (6th Cir. 2005).

To toll the running of the statute of limitations, however, a post-conviction motion must be *properly filed*. 28 U.S.C. § 2244(d)(2); *see Wall v. Kholi*, 562 U.S. 545, 550–51 (2011). A post-conviction application is not *properly filed* unless "'its delivery and acceptance [follow] the applicable laws and rules governing filings'—including any state-imposed time limits." *Davis v. Bradshaw*, 900 F.3d 315, 323 (6th Cir. 2018). Under this "understanding, a [post-conviction] petition filed after a time limit, and which does not fit within any exceptions to that limit, is no more 'properly filed' than a petition filed

---

[7]     Mock's contrary argument, Doc. 9, at 9, is mistaken. Whether a motion for a new trial in a civil case in an Ohio court constitutes a direct or collateral attack on a judgment is irrelevant. And while it may be that a timely motion under Federal Rule of Civil Procedure 60 "for a new trial suspends the finality of a judgment," Doc. 9, at 9 (quoting *Overbee v. Van Waters & Rogers*, 765 F.2d 578, 580 (6th Cir. 1985), that rule had no application to Mock's motion filed in a criminal matter in an Ohio court.

after a time limit that permits no exception." *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005).

The trial court rejected Mock's motion because it was untimely and Mock failed to carry his burden to show by "clear and convincing evidence that he was unavoidably delayed from obtaining evidence." Doc. 5-2, at 464–71. In other words, "it did not meet Ohio's rules governing new-trial motions." *Davis*, 900 F.3d at 324. As result, and consistent with *Davis*, which also involved a motion for leave to file a delayed motion for a new trial based upon newly discovered evidence, *see State v. Davis*, 2013-Ohio-846, 2013 WL 936241 (Ohio Ct. App. March 11, 2013), Mock's motion for a new trial was not *properly filed*. *See Davis*, 900 F.3d at 324; *Fortson v. Eppinger*, No. 1:15-cv-2078, 2016 WL 11259032, at *21 (N.D. Ohio Nov. 21, 2016), *report and recommendation adopted*, No. 1:15-cv-2078, 2017 WL 603086 (N.D. Ohio Feb. 15, 2017). Mock's motion, therefore, did not toll the statute of limitations.[8] *See Allen v. Siebert*, 552 U.S. 3, 7 (2007) ("'When a postconviction petition is untimely under state law, "that [is] the end of the matter" for purposes of § 2244(d)(2).'") (citation omitted).

Even if this analysis is mistaken, however—even if the motion for a new trial was *properly filed*—Mock can't prevail. As noted, at best, Mock's motion for a new trial would have tolled the time for filing a habeas petition; it

---

[8]     Neither the fact that Mock raised a *Brady* issue, nor his belief that the trial court should have granted his motion changes this analysis. *See* Doc. 9, at 9.

26

wouldn't have restarted the clock. *See Lopez*, 426 F.3d at 345–46. One hundred days had already passed from September 5, 2018, when Mock's conviction became final and December 14, 2018, when he filed his motion for a new trial. That would have left 265 days.

Indulging the assumption that the motion was *properly filed*, the Ohio Supreme Court on June 8, 2021, declined to exercise jurisdiction to review the appeal of the denial of Mock's motion for a new trial. In this scenario, the clock would have started running the next day. *See Scarber v. Palmer*, 808 F.3d 1093, 1095 (6th Cir. 2015). Mock would have had until March 1, 2022—265 days after June 9, 2021—to file his habeas petition.[9] But he didn't file it until three months later. Review of the first four grounds in Mock's petition is thus barred by the statute of limitations.

### 1.2.  *28 U.S.C. § 2244(d)(1)(D) doesn't apply*

Mock asserts that he is entitled under 28 U.S.C. § 2244(d)(1)(D) to a later start date for the statute of limitations.[10] Doc. 9, at 11–12. Under

---

[9]  The time tolled under Section 2244(d)(2) does not include the 90-day window for seeking certiorari with the Supreme Court. *See Scarber*, 808 F.3d at 1095.

[10]  Mock's argument necessarily only implicates the grounds raised in his petition that concern the matters raised in his motion for a new trial. Ground three, which concerns Mock's allegation of ineffective assistance of trial counsel, was not raised in Mock's motion. Review of that ground is thus barred by 28 U.S.C. § 2244(d)(1)(A) and Mock does not claim otherwise.

Also, to the extent Mock seeks to challenge the denial of his suppression motion, his challenge is not cognizable in a habeas petition. *See Stone v. Powell*, 428 U.S. 465, 482 (1976) ("where the State has provided an opportunity for full

subparagraph (D), the statute of limitations would start on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." It's Mock's burden to show that Section 2244(d)(1)(D) applies. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006). But he offers very little to support his burden. And what he does say concerns only his *Brady* claims and the "issue of evidence [that was] improperly suppressed and misrepresented that was discovered while investigating issues for" his "Motion for a new trial."[11] Doc. 9, at 12.

The reasoning of the trial and appellate courts' rejection of Mock's motion for a new trial applies equally here. To the extent Mock's argument is based on what Patterson allegedly learned from Yelsky, Mock offers nothing about what delayed Patterson until 2018, after Mock exhausted his direct appeals, from speaking with Yelsky. *See* Doc. 5-2, at 469. And "[t]he role of the

---

and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial"); *Good v. Berghuis*, 729 F.3d 636, 640 (6th Cir. 2013) ("Good could, indeed did, present his suppression motion to the state trial court, and the trial court rejected it. He presented it again to the state appellate court, and the appellate court rejected it once more. That suffices to preclude review of the claim through a habeas corpus petition under *Stone v. Powell*.").

[11]    Mock doesn't say anything about the jury notes. Although he mentions them in his petition, *see* Doc. 1, at 5, they don't relate to the grounds that he raised in his petition. No matter, as the trial court said, Mock's trial record was available to Patterson by November 7, 2016. Doc. 5-2, at 467. And Patterson prosecuted Mock's appeals. So he not only had access in late 2016 to the jury notes that Head later "found," he had a reason to find them. Mock would not be able to show that Section 2244(d)(1)(D) could apply to save any claim related to the jury notes.

confidential informant and the basis of the GPS warrants were key to the earlier suppression hearing," which occurred in June 2016. *Id*. So Mock would have known about "[t]hese matters … even before the trial." *Id*.

Mock also says nothing about the delay in contacting Jordan or Fambro. As the trial court remarked, Jordan is the mother of Mock's child, and Mock and his counsel should have understood Jordan's and Fambro's "relevance to the case" because "their names had come up during the suppression hearing [in 2016] as being on the call logs." Doc. 5-2, at 470; *see* Doc. 5-2, at 603.

With nothing from Mock on the issue, all that can be said is that Mock's claims "could have been discovered through the exercise of due diligence" by sometime in 2017, at the latest. The statute of limitations would have run on those claims in 2018, well before Mock filed his petition.

For two reasons, Mock's motion for a new trial doesn't help him regarding a later start date under Section 2244(d)(1)(D). First, as discussed above, the motion was not *properly filed*. So it doesn't toll the statute of limitations.

Second, even if the motion did toll the statute of limitations, the clock starts running when "evidence 'could have been discovered through the exercise of reasonable diligence.'" *McSwain v. Davis*, 287 F. App'x 450, 454 (6th Cir. 2008) (quoting 28 U.S.C. § 2244(d)(1)(D)). Assuming Mock's motion for a new trial tolled the running of the statute of limitations, which it didn't, "the time that elapsed between the discovery of the new evidence and the" filing of

Mock's motion, "as well as the time that elapsed after the conclusion of the state post-conviction proceedings must both be factored into the calculation of the one-year limitations period." *Id*.

If Mock's claims could have been discovered in 2017, the clock would have already run out by December 14, 2018, when Mock filed his motion. Moreover, Patterson contacted Jordan, Yelsky, and Fambro, in March, May, and July, 2018, respectively. Doc. 5-2, at 603. If the Court were to generously conclude that the evidence "could [only] have been discovered through the exercise of reasonable diligence" by July 7, 2018, when Patterson spoke to Fambro, Doc. 5-1, at 682, Mock's argument would still fail, because 159 days elapsed from July 8, 2018, until he filed his motion on December 14, 2018. And over 350 days elapsed from June 8, 2021, when the Ohio Supreme Court declined to review Mock's appeal of the denial of his motion and June 1, 2022, when he filed his habeas petition. Mock's petition as to grounds one through four would thus be untimely under Section 2244(d)(1)(D). *See McSwain*, 287 F. App'x at 454.

### 1.3.   *Mock is not entitled to equitable tolling*

Mock, however, argues that he should benefit from equitable tolling, arguing that his time to file his habeas petition should be tolled due to prosecutorial misconduct. Doc. 9, at 8–9. He asserts that the State's suppression of evidence and failure "to provide the jury notes to the defense …

30

could not have been discovered previously."[12] *Id.* at 10. To be sure, the statute of limitations in Section 2244(d) is subject to equitable tolling. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012). To show entitlement "to equitable tolling, a habeas petitioner must establish: (1) that he has diligently pursued his rights; and (2) 'that some extraordinary circumstance stood in his way and prevented timely filing'" his habeas petition. *Id.* at 462 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). The burden to show entitlement to equitable tolling rests on the petitioner. *Id.*

Mock's equitable tolling argument fails at the starting gate. Even accepting Patterson's and Head's affidavits and putting aside the unexplained delay from November 2016 to some undetermined time in 2018 when Mock and his counsel allegedly learned of the facts supporting the basis for Mock's motion for new trial, Mock knew the facts of which he complains by the time in December 2018 when he filed his motion for a new trial. But Mock doesn't say anything about why he waited from then until over three years later when he filed his habeas petition.

The tenor of Mock's filings suggests the belief that when equitable tolling is warranted, it provides an open-ended window in which to file a petition. But that's not how it works. Rather, the petitioner seeking to benefit

---

[12]    Mock also says that "he was never provided notice of the filing requirements and has been incarcerated since his conviction." Doc. 9, at 11. These circumstances do not warrant tolling. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012).

from equitable tolling must act with diligence to protect his rights. *See Keeling*, 673 F.3d at 463–64; *see also Biophone Corp. v. W. Elec. Co.*, 91 F.2d 727, 727 (3d Cir. 1937) ("equity favors the vigilant and looks with disfavor on the dilatory suitor").

Mock also appears to suggest that due to the exhaustion requirement, he needed to wait to file his petition until after the Ohio Supreme Court ruled on his appeal from the denial of motion for a new trial. Not so. As the Supreme Court has explained, the "solution to this 'predicament'" is to "'fil[e] a "protective" petition in federal court and ask[ ] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted.'" *Davis*, 900 F.3d at 324 (quoting *Pace*, 544 U.S. at 416–17). Mock's equitable tolling argument thus fails.

## 2. *Ground five is not cognizable*

In ground five, Mock challenges the denial of his motion for a new trial.[13] The Sixth Circuit, however, "has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002) and *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986)); *see Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854 (6th Cir. 2017). The Court has explained that challenges to "state collateral

---

[13]    To the extent that ground four encompasses a challenge to the denial of Mock's motion for a new trial, this analysis would apply to ground four, as well.

post-conviction proceedings 'cannot be brought under … 28 U.S.C. § 2254,' because 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and … the traditional function of the writ is to secure release from illegal custody.'" *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 246, in turn quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). And a successful challenge to state collateral post-conviction proceedings "would not 'result [in] … release or a reduction in … time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention.'" *Id.* (quoting *Kirby*, 794 F.2d at 247). Mock's challenge to the denial of his motion for a new trial is thus not cognizable. *See Bridges v. Gray*, No. 19-3297, 2019 WL 8301101, at *1, *5 (6th Cir. Nov. 21, 2019) (concerning the denial of a delayed motion for a new trial); *Miller v. Phillips*, No. 1:20-cv-2135, 2021 WL 2946158, at *6 (N.D. Ohio July 14, 2021).

Moreover, in conducting habeas review, this Court does not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Rather, this Court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States alleged violations of state laws or rules." *Estelle*, 502 U.S. at 68. And merely invoking a constitutional provision is not enough to turn a state-law issue into a constitutional question. *Cf. Torres-Aguilar v.*

33

*INS*, 246 F.3d 1267, 1271 (9th Cir. 2001) ("a petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an abuse of discretion argument in constitutional garb").

Even if errors in post-conviction proceedings were not outside the scope of federal habeas corpus review, Mock would do no better. Mock argues that the trial court violated certain of his constitutional rights by denying his motion for a new trial. Doc. 9, at 9–11. Giving Mock's arguments the liberal construction to which he is entitled, *see Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985), Mock argues that because he asserted constitutional violations as a basis for his motion, enforcing a procedural rule that resulted in a denial of his motion was itself a due process violation. *Id*. at 10–11. But that's not enough to show a due process violation.

"[I]t is normally 'within the power of the State to regulate procedures under which its laws are carried out.'" *Patterson v. New York*, 432 U.S. 197, 201 (1977). To "rise to the level of due process violation[]," a state-court ruling would have to "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43, 53 (1996). The ruling must be "so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Here, the rule that was enforced against Mock was that, because his motion was untimely, he was required to show "by clear and convincing

34

evidence, that he was unavoidably prevented from filing the motion for new trial or discovering the evidence and he sought leave within a reasonable time." Doc. 5-2, at 598. Mock, however, doesn't explain why requiring him to make this showing would offend fundamental fairness. And given Ohio's legitimate interest in the finality of its courts' judgments, *see Sawyer v. Whitley*, 505 U.S. 333, 338 (1992), *State v. Gumm*, 814 N.E.2d 861, 862–63 (Ohio 2004), it is less than clear how enforcing this rule could be thought to offend fundamental fairness, *cf. Engle v. Isaac*, 456 U.S. 107, 135 (1982) (holding that a petitioner's "fail[ure] to comply with Ohio's procedures for raising [a] contention, and" failure to show "cause for the default, … barred [the petitioner] from asserting that claim under 28 U.S.C. § 2254"). So Mock has failed to demonstrate a constitutional violation.[14]

## Conclusion

For all the reasons set forth above, I recommend that the Court dismiss Mock's petition.

Dated: May 19, 2023


       */s/ James E. Grimes Jr.*
       James E. Grimes Jr.
       U.S. Magistrate Judge

---

[14]    Mock's motions for an evidentiary hearing, Doc. 10, and to set bond, Doc. 11, are denied.

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).